**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
Criminal No. 19-CR-20 (DWF/LIB)

------------------------------------------------------

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

CHRIS MORALES,

                Defendant.

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO
DISMISS INDICTMENT**

------------------------------------------------------

## <u>INTRODUCTION</u>

The Defendant, through counsel, has filed a motion to dismiss the Government's indictment pursuant to Federal Rule of Criminal Procedure 12(b). The Defendant asserts that his Sixth Amendment right to the effective assistance of counsel has been violated and that the appropriate remedy for such a violation is dismissal of the indictment against him. *See United States v. Morris*, 470 F.3d 596 (6th Cir. 2006), *reh'g and reh'g en banc denied* (6th Cir. Apr. 11, 2007); *United States v. Nixon*, 318 F.Supp.2d 525 (E.D. Mich. 2004).

The first section of the argument below clarifies that there should have been no confusion over the issue the Defendant has raised. Despite numerous written and oral communications between the Defense and Government prior to the evidentiary hearing, the Government asserted a belief at the evidentiary hearing that the Defendant was litigating a violation of double jeopardy. This was never the case and the Government's apparent misunderstanding is illusory.

The second section of the argument addresses the Government's subsequent claim at the evidentiary hearing that the Defendant's claim of ineffective assistance of counsel at this

1

procedural standpoint is not ripe, despite the presence of binding appellate precedent to the contrary.

Finally, the third and fourth sections relate to the Defendant's claim that there has been a violation of his Sixth Amendment right to counsel. Because of the intertwined coordination and investigation between state and federal authorities/agencies in the prosecution of the Defendant, the appropriate remedy under these facts is dismissal of the indictment.

## ARGUMENT

**I.**    **Defendant's motion to dismiss provided sufficient notice to the Government as to the issues to be litigated and any potential misunderstanding was alleviated by the parties' communications prior to the filing of the motion and prior to the evidentiary hearing.**

The Defendant's motion states that, "as this case originally began in Minnesota state court, the subsequent indictment in federal court is now barred and must be dismissed ***pursuant to*** *United States v. Morris*, 470 F.3d 596 (6th Cir. 2006) and *United States v. Nixon*, 318 F.Supp.2d 525 (E.D. Mich. 2004). Dkt. 56 (emphasis added). The basis for the Defendant's motion to dismiss has never been a violation of double jeopardy.

Both *Morris* and *Nixon* address the issue of improper state/federal cooperation in the context of the Sixth Amendment right to counsel and *Morris* provides specific grounds for the requested remedy: dismissal of the indictment. The *Morris* opinion *never once* references double jeopardy, and the Defendant's motion specifically cited *Morris*. *Morris* concerned state/federal cooperation in the context of a pre-indictment right to counsel during state court proceedings. *See Morris*, 470 F.3d at 602 ("We also agree with the district court that Morris was denied the effective assistance of counsel under *Strickland* and *Hill*.").

At the evidentiary hearing, this Court informed the parties that it had declined to review the parties' response and surresponse briefs, submitted after the filing of the Defendant's motion

and the Government's response. The Government, however, was in receipt of those submissions, read those submissions, and responded to those submissions *prior* to the evidentiary hearing taking place. As is required by the Local Rules, the Defense and Government had also communicated prior to the submission of the Defense motion in advance of the evidentiary hearing to narrow/clarify the issues. As recently as the Friday (4/26/19) before the hearing on the following Monday (4/29/19), undersigned counsel spoke over the phone with counsel for the Government and again clarified that the Defense motion was *not* for dismissal based on a violation of double jeopardy. The Defense further clarified that the motion *was* for dismissal on the basis of a Sixth Amendment violation.

Despite the fact that this Court did not review the parties' subsequent submissions, the Government *did*. It cannot now claim that it misunderstood the issue to be something other than it was. The language "pursuant to" in the Defense's motion is a statement that concerns *the remedy sought*. The Defense motion did not string cite to every conceivable legal authority on which the Defense might rely in supporting its motion in a memorandum that would be submitted *after* testimony was received at the evidentiary hearing. The body of legal authority supporting the Defendant's motion is properly addressed in this written submission. The Government was on notice of the issues to be litigated prior to the evidentiary hearing and any claim to the contrary is illusory.

II.     **The Defendant's claim of ineffective assistance of counsel at this procedural posture is not premature because of the close working relationship between the state and federal authorities in investigating and charging the Defendant.**

The Government is likely to claim, as it did through counsel at the evidentiary hearing, that Defendant's ineffective assistance of counsel challenge is premature. This is not true. This Court

has the authority and jurisdiction to remedy a state court constitutional violation from this procedural standpoint. *See United States v. Bird*, 287 F.3d 709, 714 (8th Cir. 2002) ("Therefore, we hold that Red Bird is entitled to the protections of the Sixth Amendment."), *reh'g and reh'g en banc denied* (8th Cir. Sep. 23, 2002); *Morris*, 470 F.3d at 603 ("[W]e . . . conclude that [the district court] does have the authority to dismiss the federal indictment in order to remedy the constitutional violation."); *Nixon*, 318 F.Supp. 2d at 527 ("Therefore, I find that I do have jurisdiction to decide the question of ineffective assistance of counsel.").

Under *Bird*, which is binding Eighth Circuit authority, the Defendant may make a claim that his Sixth Amendment rights were violated at this stage of the proceedings and need not wait to raise this issue in the context of postconviction relief. In *Bird*, in the context of reviewing a pre-trial motion to suppress:

> We find that as a result of the way that tribal and federal authorities cooperated in connection with these charges, Red Bird's indictment in tribal court inherently led to his prosecution in federal court. Considering the close working relationship between tribal and federal authorities in this case, to deny Red Bird the right to counsel after the tribal indictment would deprive him of an attorney at one of the most critical stages of the proceedings against him. Therefore, we hold that Red Bird is entitled to the protections of the Sixth Amendment.

*Bird*, 287 F.3d at 714.

In *Bird*, there was a close working relationship between the tribal and federal authorities, and, as in *Bird*, here, the close cooperation—or intertwining—of agencies under separate sovereigns led to Defendant being charged first in state and then in federal court. The fact that *Bird* involved a tribal proceeding rather than a state court proceeding is immaterial. The overarching concern was the post-arrest coordination between the agencies of two sovereigns that were involved in the investigation and prosecution of the same acts and transactions. Hence, as in *Bird*,

Defendant's Sixth Amendment rights attached as soon as he was *Mirandized* by joint state-federal agents and arraigned in state court.

The Defendant's concern is not that the state and federal agencies coordinated in *finding* the Defendant and the alleged victim. The missing person report certainly created an exigency under which coordination by the agencies was to be encouraged. *See United States v. Leathers*, 354 F.3d 955, 960 (8th Cir. 2004) ("Referrals and cooperation between federal and state officials . . . are common place and welcome.") (citing *Bartkus v. Illinois*, 358 U.S. 121, 123 (1959)); *see also Bird*, 287 F.3d at 713 ("We note at the outset that it is common for Indian tribal governments and federal authorities to cooperate in the investigation and prosecution of crimes committed on reservations."). After the Defendant's arrest, however, and after law enforcement found the alleged victim and arrested the Defendant, that exigency ended. Despite this, the significant coordination between the state and federal agencies continued—and frankly, in this case, there was little or no real distinction between the state and federal investigations because the key players simultaneously worked for the benefit of both sovereigns.

A. *There was significant post-arrest coordination between state and federal agencies during the pendency of the Defendant's state court proceedings.*

Both SA Fraik and Chief Deputy Walton testified that they were the two members of law enforcement that spearheaded the investigation of the Defendant. Special Agent Fraik is currently, and was at the time, employed by the Minnesota Bureau of Criminal Apprehension ("MNBCA") and was a member of the North Star Task Force. "Prior to [his] employment with the MNBCA, [he] was a licensed peace officer with the Beltrami County Sheriff's Office from 2010 to 2015." Dkt. 1 at ¶ 1.

> [SA Fraik has] been employed by the MNBCA since November 2015. *** [He is] also a Task Force Officer (TFO) with the North Star Fugitive Task Force, which is a multi-agency task force led by the U.S. Marshals Service and was established to

seek out fugitives and enforce federal predatory offender laws. As a TFO, [he is] authorized to investigate violations of United States laws and to seek and execute arrest and search warrants supporting a federal task force under title 18 authority.

*Id.* at ¶1; *see also id.* at ¶ 4.

Chief Deputy Walton testified that he is currently employed by the Beltrami County Sheriff's Office and is a member of the Internet Crimes Against Children ("ICAC") task force and was a member of the ICAC task force when the initial missing person report was made in this case. The ICAC task force is a national network of 61 coordinated task forces representing over 4,500 federal, state, and local law enforcement and prosecutorial agencies.[1] As an ICAC agent, Chief Deputy Walton received, through the Department of Justice—the agency prosecuting this matter— federal funding, support, resources, and training to assist in the investigation and prosecution of internet crimes involving children.

Both SA Fraik and Chief Deputy Walton (then Sergeant Walton) worked in tandem during the investigation, and numerous other state and federal agents were also inextricably involved.

According to SA Fraik's Affidavit in support of the federal criminal complaint, the Beltrami County Sheriff's Office was originally contacted on November 7, 2017, in regard to a missing juvenile. Dt. 1, ¶ 11. Through a series of tips, Chief Deputy Walton linked a suspect vehicle seen driving with Illinois plates, to the Defendant's father in Illinois. *Id.* at ¶¶ 16; 17. The Defendant's father informed Chief Deputy Walton that the Defendant was the regular driver of the Jeep. *Id.* at ¶ 18.

Law enforcement obtained the Defendant's phone number from his father and sent an exigency request to Verizon Wireless to obtain location information for the handset, obtained a Minnesota state court warrant for a pen register/trap and trace/tracking warrant, and determined

---

[1] https://www.icactaskforce.org

that the Defendant was likely in Minneapolis. *Id.* at ¶ 19. Special Agents from the BCA were contacted and responded to downtown Minneapolis. "MNBCA Special Agent Katie Booth located the white jeep in downtown Minneapolis" and "MNBCA Senior Special Agent Charles Phill located Minor 1 and Christopher Morales walking together in the same approximate area of the white Jeep." *Id.* at ¶ 20. BCA agents arrested Morales. *Id.*

While the coordination was warranted by the exigency, the exigency ended once law enforcement had detained the Defendant and discovered the alleged victim safe and unharmed. But the investigation remained a joint federal-state undertaking for the duration that it was open.

BCA/ICAC task force agents conducted in-custody interviews of the Defendant in Minneapolis after his arrest, aiming to obtain incriminating evidence. Dkt. 1, ¶ 7. BCA/ICAC task force agents also interviewed the alleged victim after the Defendant's arrest and obtained allegedly incriminating evidence. *Id.* at ¶¶ 27—30. On 11/7/2017, Beltrami County Investigator Thompson applied for, and was granted, a search warrant to obtain the alleged victim's Facebook account records. Dkt. 1, ¶ 31. SA Fraik, however, "assisted Investigator Thompson by serving the warrant on Facebook." *Id.* When those records were disclosed the very next day, they were disclosed to SA Fraik, who alone conducted the review of those records. *See id.* at ¶ 32 ("On 11/8/2017, [SA Fraik] received the requested records from Facebook."). SA Fraik specifically included portions of the conversations as block quotes in his Affidavit supporting issuance of the subsequent federal criminal complaint. *See id.*

SA Fraik also applied for, and was granted, a state court search warrant to search the Defendant's Jeep. *Id.* at ¶ 40 ("On November 8, 2017, [SA Fraik] applied for, and was granted, a search warrant requesting to search the white Jeep with Illinois License Plate #E161670."). "Special Agent Craig Martin and other BCA Special Agents executed the search warrant." *Id.* As

SA Fraik testified, many of the state court search warrants subsequently issued granted authority to search to both SA Fraik and members of the Beltrami County Sheriff's Office (including Chief Deputy Walton, and Officer William Thompson). SA Fraik testified that this coordination was a normal practice.

Chief Deputy Walton also obtained a state court search warrant to search the Defendant's Apple iPhone. Dkt. 1, ¶ 38. Chief Deputy Walton's review of the content downloaded from the iPhone revealed not only what he believed to be the Defendant's *possession* of child pornography, but what he also believed to be *production* of child pornography. Specifically:

> Sergeant Walton reviewed content downloaded from the Apple iPhone. Sergeant Walton located a video[.] Sergeant Walton observed a female in the video that he recognizes at Minor 1. Sergeant Walton can hear a male speaking in the video. Sergeant Walton recognizes the male voice as sounding like [the Defendant].

Dkt. 1, ¶ 39.

SA Fraik, in turn, used the fact that the Defendant's iPhone was manufactured outside of the state and District of Minnesota in an attempt to establish jurisdiction for the subsequent federal charges for the production of child pornography. Dkt. 1, ¶ 38. Those subsequent federal charges allege the production of child pornography, and the state charges at the time were for possession of child pornography. Based on SA Fraik's affidavit, however, it appears that the state court prosecutors *could* have chosen to prosecute the Defendant for production of child pornography in state court given Sergeant Walton's investigation of the iPhone, but, for whatever reason, opted not to. *See, e.g.,* Minn. Stat. § 617.246, subd. 2.

Importantly, SA Fraik testified that he was monitoring the state case as it progressed through state court. SA Fraik was in contact with the U.S. Attorney's Office, and he was the agent who subsequently signed the affidavit in support of the federal criminal complaint.

There was significant post-arrest coordination between the State and Federal agencies in terms of gathering evidence against the Defendant. Because Defendant was *Mirandized* during the joint investigation and subsequently arraigned in state court—an "adversarial proceeding" per *Bird*—the Defendant's Sixth Amendment right to counsel had clearly attached well before he was indicted by the federal grand jury.

## III. The Defendant was denied the effective assistance of counsel by his State Court attorney.

On November 9, 2017—two days after the Defendant's arrest—relying on information developed by the joint state-federal investigation, the Beltrami County Attorney's Office charged the Defendant with five counts of possession of child pornography in Minnesota State Court (Court File No. 04-CR-17-3569), in violation of Minn. Stat. § 617.247.4(a).

The Defendant retained Robert Duranske, who represented the Defendant at all pretrial stages of those proceedings. Mr. Duranske has been a licensed attorney in Minnesota since 1969 and was licensed to practice in federal court in approximately 1970. He is a former attorney/member of the federal defense panel. Mr. Duranske is aware of the great exposure individuals face when charged with federal sex offenses. As Mr. Duranske also testified, while he was handling the Defendant's state court case, he was also handling a civil, parental termination case that involved a client who had received a 25-year federal sentence on a collateral criminal sex case. Yet, Mr. Duranske further testified that he was unfamiliar with the *Petite* Policy, which is derived from a 1960 United States Supreme Court case.

Early on in his representation of the Defendant, Mr. Duranske mentioned the potential that the Defendant could be charged federally for the conduct at issue in the state case. Mr. Duranske testified that, in retrospect, he probably would have leaned on the Defendant to plead guilty had he known that the U.S. Attorney's Office was going to become involved. However, although there

was a plea offer from the state on the table, Mr. Duranske never explained to Defendant the advantages of taking the state's plea offer in light of the potential for federal prosecution, nor did he encourage the Defendant to plead in order to minimize federal exposure.

As the Defendant testified, the only conversation that he had with Mr. Duranske about the possible intervention by the federal government to prosecute the case was at the very early stages after his initial arrest. Mr. Duranske never adequately informed the Defendant about the differences between state and federal sentencing. Mr. Duranske never advised the Defendant regarding federal mandatory minimum sentences and mandatory periods of conditional release, or the potential additional federal charges with which the Defendant might have been charged. The Defendant testified that, had he been informed of those differences, he would have changed his mind about continuing to proceed toward trial and he would have pleaded guilty. *See Nixon*, 318 F. Supp. 2d at 530 ("However, given that defendant Nixon had two different attorneys at the state level, and defendant Curry had yet another attorney, none of whom communicated the magnitude of the potential sentences defendants faced in federal court, I suspect this case is not as unique as the government maintains."); *see also Morris*, 470 F.3d at 602 ("The inability of Morris's counsel to accurately estimate his federal sentencing guideline range and the resulting incorrect estimate factored into Morris's calculus in contemplating the state's plea offer.").

As the state case progressed, Mr. Duranske did not again raise the issue of potential federal charges and continued to push toward trial. Mr. Duranske believed that as more time passed, the likelihood of federal charges being filed would decrease. Mr. Duranske also testified, however, that he knew there was no federal statute of limitations at issue, and, through discovery, he continued to receive ongoing disclosures from the Beltrami County Attorney's Office related to the Defendant's communication with the alleged victim. These disclosures related to

communications through internet-based programs/websites like Facebook and SnapChat. Mr. Duranske also knew that the state court charges against the Defendant were for possession of child pornography and that the discovery received from the state tended to indicate that the Defendant and the alleged victim were *producing* child pornography. Mr. Duranske also knew that police reports indicated that the Defendant drove to Minnesota from Illinois to meet the alleged victim. The case progressed for 11 months without federal charges, in spite of the intertwined state-federal investigation.

A final pretrial hearing was scheduled for September 4, 2018, at which the parties were to discuss and finalize trial issues, as well as set the trial date. Mr. Duranske testified that he believed Mr. Morales's state court jury trial would commence the following week.

However, on September 4, 2018, at the final state court hearing, but prior to appearing on the record, Mr. Duranske was informed by the state prosecutor that federal agents were present at the hearing and would be arresting the Defendant on federal criminal charges that stemmed from— as Mr. Duranke testified—the same series of transactions for which Defendant was first arrested. While he was in court, federal agents arrested the Defendant on the federal complaint (the Affidavit for which was authored by SA Fraik), and the state prosecutor subsequently dismissed its charges against the Defendant.

On January 22, 2019, the United States Attorney's Office filed its indictment against the Defendant.

A. *The Sixth Amendment right to counsel attached at the commencement of adversarial proceedings in which the state and federal investigations were inextricably intertwined.*

Defendant's arrest and arraignment—after an overlapping state-federal investigation— triggered the Defendant's Sixth Amendment right to counsel: A right that not only afforded the Defendant an attorney but demanded *effective* representation. *See Strickland v. Washington*, 466

U.S. 668 (1984); *see also Hill v. Lockhart,* 474 U.S. 52 (1985) (holding a criminal defendant is entitled to competent advice of counsel in plea negotiations).

"Whatever else it may mean, the right to counsel . . . means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972)). The Sixth Amendment guarantees the accused the right to rely on counsel as a medium between him and the authorities. *Maine v. Moulton,* 474 U.S. 159, 176 (1985).

*Massiah v. United States,* 377 U.S. 201, 207 (1964), explains that the period between an indictment and a trial, the period of "thorough-going investigation and preparation," is perhaps the most critical period of the proceedings and a defendant is "as much entitled to [counsel's aid] during that period as at the trial itself." *Massiah,* 377 U.S. at 205 (quoting *Powell v. Alabama,* 287 U.S. 45, 57 (1932)). The Supreme Court has consistently affirmed the rule announced in *Massiah. See, e.g., Michigan v. Jackson,* 475 U.S. 625, 632 (1986).

In *Bird*, the Eighth Circuit applied the analysis in *Massiah* and held:

> At the time that Red Bird was interviewed, he had been indicted and had been appointed an attorney who was licensed to serve him in both tribal and federal court. Tribal authorities informed Agent Weir of the tribal indictment and the possible violation of federal law. Agent Weir then worked in tandem with the tribal criminal investigator to deliberately elicit information from Red Bird, knowing that Red Bird had been indicted in an adversarial proceeding for the same charge and that Red Bird was represented by an attorney on that charge. This is not a case where the federal agent was unaware of the tribal charge or unaware of the defendant's representation by counsel. Rather, it is a case where two sovereigns worked together to investigate conduct that violates the laws of both.

*Bird*, 287 F.3d at, 713-14.

Because of "the way that tribal and federal authorities cooperated in connection with these charges, Red Bird's indictment in tribal court inherently led to his prosecution in federal court." *Id.* Due to "the close working relationship between tribal and federal authorities in this case," the Eighth Circuit held that, "to deny Red Bird the right to counsel after the tribal indictment would deprive him of an attorney at one of the most critical stages of the proceedings against him" and that the defendant was entitled to Sixth Amendment protections. *Id.* Similarly, here, the Defendant was represented by Mr. Duranske, who is licensed and in good standing in both state and federal court and could have represented the Defendant in federal court.

The Defendant had been arraigned in state court and had proceeded through numerous formal pre-trial hearings. The Defendant's counsel continued to receive discovery that was developed by joint state/federal task force agents. To an attorney licensed in both state and federal court—and with significant experience in both state and federal court—this should have indicated that federal charges were not just a potential but were *likely*, especially in light of the federal government's involvement with and oversight of the investigation. To a reasonable attorney, this would have indicated that the risk of federal prosecution remained. While, unlike *Bird*, the agents here did not attempt to elicit statements from the Defendant after the Defendant retained Mr. Duranske, both Chief Deputy Walton and SA Fraik testified that the investigation was ongoing. This included filing and executing numerous search warrants, reviewing digital evidence, reviewing physical evidence, such as phones and laptops, and conducting additional interviews. This information was disclosed to Mr. Duranske.

While the Eighth Circuit is admittedly among the minority of Circuits to have decided this issue, *Bird* is still binding on this Court. *See also United States v. Mills*, 412 F.3d 325, 330 (2d Cir. 2005) (interpreting *Cobb* to incorporate only the *Blockburger* test and not the dual-sovereignty

doctrine into the Sixth Amendment right-to-counsel context.); *see also Texas v. Cobb*, 532 U.S. 162 (2001). The Government may argue that because the crimes charged in state court do not have precisely the same elements as the crimes charged in federal court, that the state court right to counsel is irrelevant. However, that rule, announced in *Texas v. Cobb,* 532 U.S. 162 (2001), applies to uncounseled interrogations. All that need be shown is that the state and federal charges are inextricably intertwined and arise from the same offense(s). *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991).

This is because criminal codes are lengthy and detailed, often proliferating "overlapping and related statutory offenses" to the point where prosecutors can easily "spin out a startlingly numerous series of offenses from a single . . . criminal transaction." *Ashe v. Swenson,* 397 U.S. 436, 445 n. 10 (1970). Again, the state court prosecutors could have charged the defendant with many of the alleged crimes contained in the federal indictment, including the production of child pornography based on Chief Deputy Walton's review of the Defendant's Apple iPhone.

Here, the state and federal charges involve the same transactions with the same victim in the same locations and over the same periods of time. They were jointly investigated by the state and federal governments from the outset. At the evidentiary hearing, Mr. Duranske testified that he understood the state and federal charges to have arisen from the same series of transactions. As the *Cobb* majority emphasized, "Although it is clear that the Sixth Amendment right to counsel attaches only to charged offenses, we have recognized in other contexts that the definition of an 'offense' is not necessarily limited to the four corners of a charging instrument." 532 U.S. at 172-73.

Due to the cooperation between the state and federal agencies, Defendant's Sixth Amendment right to counsel herein attached at the commencement of the Defendant's state court case.

B. *The Defendant was denied the effective assistance of counsel.*

The Defendant was denied the effective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984) and *Hill v. Lockhart,* 474 U.S. 52 (1985) (holding a criminal defendant is entitled to competent advice of counsel in plea negotiations).

*Strickland* requires two elements to establish an ineffective assistance of counsel claim: (1) counsel's performance must have fallen below an objective standard of reasonableness, and (2) there must be a reasonable probability that but for the deficient performance, the outcome of the proceedings would have been different. 466 U.S. at 694. In *Hill,* the Supreme Court applied this test in the context of plea offers, requiring that a defense attorney inform her client of plea offers and the potential penalties involved. The Court held that to establish an ineffective assistance of counsel claim, a defendant must show (1) that he did not receive such advice, and (2) "a reasonable probability that he would have pleaded guilty had he received proper advice." *Griffin v. United States,* 330 F.3d 733, 738 (6th Cir. 2003); *see Morris*, 470 F.3d at 602.

"Defense counsel has the duty to provide a client with sufficient information about the client's sentencing exposure to allow the client "to make a reasonably informed decision [regarding] whether to accept a plea offer." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) (citations omitted); *see also United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) (defense counsel has an obligation to "[a]ppris[e] a defendant about his [sentencing] exposure under the sentencing guidelines"); *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) ("A criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure

the defendant will face as a consequence of exercising each of the options available."); *see also United States v. Penoncello*, 358 F.Supp.3d 815, 822 (D. Minn. 2019).

Defense counsel also has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (quoting *Libretti v. United States*, 516 U.S. 29 (1995)). This means that defense counsel should inform a client about the "relevant circumstances" surrounding a potential plea, including the risks of declining a plea deal. *Herrera*, 412 F.3d at 580. "A defendant cannot make an intelligent choice about whether to accept a plea offer unless he fully understands the risks" of doing so. *Id.* (citing *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995))." Here, Mr. Duranske failed to meet any of these obligations, thus rendering his counsel deficient.

At the hearing, Mr. Duranske testified that there was no plea offer made in the state court proceedings but, since reviewing his case file from those proceedings, has acknowledged that he was mistaken. On August 22, 2018, the state court prosecutor emailed Mr. Duranske, making the following offer:

> However, if Mr. Morales takes responsibility for his actions and enters a guilty plea at the pre-trial on September 4 I will not add an additional count of child pornography and a count of third degree criminal sexual conduct. Based on my review of the sentencing guidelines, if he were to be found guilty with the additional charges that we are considering he would face a presumptive commit to prison for 140 months. Please let me know how Mr. Morales would like to proceed.

*See* Dkt. ___ (Affidavit of George Duranske, attached to the Defendant's Motion for Leave to Supplement the Record, filed May 13, 2019, and associated email attachments).

Mr. Duranske responded to the offer by asking what the State's recommended sentence would be, and the State responded that its recommendation would be for a guideline sentence of 39 months. *Id.* Were it not for the constitutional violation, the Defendant testified that he would

have pleaded guilty to the state court charges, making it less likely that he would have been charged federally due to the Department of Justice's *Petite* policy.

*Lafler* discusses ineffective assistance of counsel related to the consequences of accepting or rejecting a plea bargain in the context of prejudice due to the loss of the opportunity to avoid the imposition of a more severe sentence or more serious charges:

> If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown ***if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence***.

*Lafler v. Cooper*, 566 U.S. 156, 168 (2012) (emphasis added).

The prejudice is similar here. Had the Defendant been advised that pleading guilty in state court would have made it less likely that he would be charged federally, he would have pleaded guilty. Even with a plea offer in Minnesota state court that would trigger a reduced likelihood of subsequent, more-severe federal charges, the Defendant was not advised by counsel to plead. As a result, the Government was able to avoid the requirements of its own *Petite* policy and charge the Defendant with crimes that carry significantly higher—and mandatory—terms of imprisonment.

Under the *Petite* policy, it is necessarily less likely that a person charged in state court would be subsequently charged in federal court if the person had pleaded guilty and was convicted in state court. This is because a state court conviction triggers the procedures under the *Petite* policy, which requires further review and approval in order to bring subsequent federal charges. *See Justice Manual* § 9-2.031 ("The "policy applies whenever there has been a prior state . . . conviction, including one resulting from a plea agreement" based on "substantially the same act(s) or transaction(s)."); *see United States v. Wallace*, 578 F.2d 735, 740 (8th Cir. 1978) ("Pursuant to this policy, it is the usual practice for a United States Attorney to obtain approval from the Attorney

General prior to undertaking the prosecution of an individual for conduct which has already been the subject of a state prosecution."). The Government cannot predict whether the DOJ would have authorized subsequent prosecution and, frankly, it would be entirely speculative at this point to claim that the DOJ would or would not have prosecuted because there was no state court conviction or sentence imposed.

However, "Under [the *Petite*] policy the federal government **generally declines to prosecute** after a state prosecution unless the reasons for the successive federal prosecution are compelling." *Pope v. Thone*, 671 F.2d 298, 299 (8th Cir. 1982) (emphasis added); *see Rinaldi v. United* States, 434 U.S. 22, 24 n.5 (1977); *United States v. Wallace*, 578 F.2d 735, 739-40 (8th Cir. 1978), *cert. denied*, 439 U.S. 898 (1979); *see also United States v. Mech.*, 454 F.2d 849, 855-56 (8th Cir. 1971) ("The evidence indicates that such approval [under the *Petite* policy] was never obtained. This is not the first time this argument has been raised before this Court, and we admit that it troubles us. The policy established by the memorandum is wise and ought to be followed."). And where a counsel's deficient performance results in the **likelihood** of greater sentencing exposure, "any amount of additional jail time" is prejudicial. *Lafler,* 566 U.S. at 165.

Although he is a member of the federal bar who has represented numerous federal criminal defendants, Mr. Duranske testified that he was not aware of the *Petite* policy. He therefore did not advise the Defendant of this significant advantage of pleading guilty in state court. *See Lee v. United States*, 137 S. Ct. 1958, 1967 (2017) ("But where we are instead asking what an individual defendant would have done, the possibility of **even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking**.") (emphasis added). Mr. Morales was denied that information and, as Mr. Morales specifically testified, he would have pleaded guilty in state court had Mr. Duranske accurately advised the Defendant of his federal exposure—including

the limitations on charging under the *Petite* Policy as a result of a state court conviction. The Defendant's testimony establishes that this was more than a reasonable probability. *See Missouri v. Frye*, 566 U.S. 134, 147 (2012) (to establish prejudice, the Defendant "must demonstrate a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel."); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (explaining that a "reasonable probability" does not require a showing that something is more likely than not.").

Because of the DOJ's *Petite* policy, there is more than a mere possibility that Mr. Morales would have faced reduced federal exposure for the same acts and transactions had he pleaded guilty in state court. Because of Mr. Duranske's deficient performance in his failure to apprise Mr. Morales of his true federal exposure, the benefits of accepting the State's plea offer, and the potential consequences of declining to plead guilty, Mr. Morales was substantially prejudiced, in violation of the Sixth Amendment. Mr. Morales' greater federal exposure, as evidenced by the subsequent indictment, was a direct result of the Sixth Amendment violation in this case.

C.  *The remedy for the violation of the Defendant's Sixth Amendment rights under these facts is dismissal of the indictment.*

"Sixth Amendment remedies should be 'tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.' Thus, a remedy must 'neutralize the taint' of a constitutional violation, while at the same time not . . . needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (internal citations omitted). In order to avoid needlessly squandering the resources that a prosecution and appeal and/or collateral proceeding would require, the most appropriate way to neutralize the taint of the constitutional

violation is to dismiss the federal indictment at this stage of the proceedings. *See Morris,* 470 F.3d 596, 603 (as part of a joint federal state effort to address gun violence, defendant was arrested and offered a plea bargain in state court, which because he was denied the effective assistance of counsel, he declined. The charges were dismissed and defendant was then indicted in federal court for the same criminal conduct. Although the court of appeals found that the federal court lacked the authority to remand the case to state court, it ruled that the federal indictment could be dismissed to remedy the constitutional violation).

As in *Morris*, the Defendant agrees that this Court lacks jurisdiction to remand the case to state court. *See Morris*, 470 F.3d at 603. However, with dismissal of the federal indictment, Defendant would realize no windfall and the Government's competing interest of prosecuting criminal offenses would be satisfied because restoring Defendant to the position he was in prior to being federally indicted would allow state prosecutors to re-open the case and re-charge him.

Defendant's Sixth Amendment rights were violated before he was indicted but after he was arraigned on state charges following an intertwined state-federal investigation. Because previous counsel failed to advise Defendant of the extent of his federal exposure and the benefits of accepting the state's plea offer, counsel's performance was constitutionally deficient. Because Defendant would have accepted the plea offer, had he been apprised of the offer, along with the extent of his federal exposure and the plea agreement's effect on federal charging decisions, Defendant was prejudiced by counsel's deficient performance. The current federal indictment was a direct result of the Sixth Amendment violation. As such, dismissal of the federal indictment is the appropriate remedy to cure this constitutional taint.

Therefore, Defendant respectfully requests that this Court dismiss the federal indictment herein.

Respectfully submitted,

**HALBERG CRIMINAL DEFENSE**

Dated: May 13, 2019                    /s/ Marsh J. Halberg                    .
                                       Marsh J. Halberg, #39548
                                       Attorney for Defendant
                                       7900 Xerxes Ave. S., Ste. 1700
                                       Bloomington, MN 55431
                                       (612) 333-3673


Dated: May 13, 2019                    /s/ Andrew C. Wilson                    .
                                       Andrew C. Wilson, #398583
                                       Attorney for Defendant
                                       7900 Xerxes Ave. S., Ste. 1700
                                       Bloomington, MN 55431
                                       (612) 333-3673